755 S.E.2d 425

**CITY OF MYRTLE BEACH, Respondent,**

v.

**TOURISM EXPENDITURE REVIEW COMMITTEE, Appellant.**

Appellate Case No. 2011–194346.

No. 27356.

Supreme Court of South Carolina.

Heard Jan. 8, 2013.

Decided Feb. 5, 2014.

Rehearing Denied April 4, 2014.

John M.S. Hoefer and Chad N. Johnston, both of Willough-by & Hoefer, PA, of Columbia, for Appellant.

Michael W. Battle, of Battle & Vaught, PA, of Conway, for Respondent.

Justice KITTREDGE.

In South Carolina, a sales tax of seven percent is imposed on all gross proceeds derived from the rental of sleeping accommodations to overnight guests. S.C.Code Ann. § 12–36–920(A). That seven percent tax is comprised of several components.[1] At issue in this case is the two percent local accommodations tax (A–Tax), the proceeds of which are remitted to the counties and municipalities where it was collected. S.C.Code Ann. § 12–36–2630(3). Counties and municipalities receiving A–Tax revenues must expend those funds in accordance with the provisions of the South Carolina Accommodations Tax Act (the Act). S.C.Code Ann. §§ 6–4–5 to –35. The Legislature created a statewide oversight body—the Tourism Expenditure Review Committee (TERC)—to ensure counties and municipalities comply with the basic requirements and restrictions set forth in the Act. S.C.Code Ann. § 6–4–35.

When the Respondent City of Myrtle Beach (the City) transferred $302,545 of A–Tax funds into the City's general fund and bypassed the Act's provisions, Appellant TERC invoked its authority under section 6–4–35(B) and certified those expenditures as "noncomplian[t] to the State Treasurer." The Administrative Law Court (ALC) reversed TERC's non-compliance certification. The ALC's acceptance of the City's characterization of the funds as "general funds" was error, for the City's internal documents unmistakably reveal that it "decided to sweep accommodations tax funds to the General Fund to cover tourism related public services." We reverse the ALC.

## I.

Under the Act, some A–Tax funds are allocated as "general funds" and some are not. The Act allocates the first $25,000

---

1. The two components not at issue in this case are as follows: four percent is credited to the state public school building fund and the remaining one percent is credited to the South Carolina Education Improvement Act of 1984 Fund. S.C.Code Ann. § 59–21–1010(A)–(B).

of A–Tax funds collected by a county or municipality to the local government's unrestricted general fund, and the local government may spend these funds however it sees fit. S.C.Code Ann. § 6–4–10(1). Five percent of the remaining balance is likewise allocated to the general fund, and thirty percent is allocated to a restricted special fund to be used only for the advertising and promotion of tourism. S.C.Code Ann. § 6–4–10(2)–(3). The remaining sixty-five percent (65% Funds) is allocated to a separate fund to be used for the special purpose of promoting and accommodating tourism. S.C.Code Ann. § 6–4–10(4)(a)–(b). The A–Tax funds at issue here are part of the 65% Funds, and as a result, are subject to the guidelines and TERC oversight as set forth in the Act.[2]

Counties and municipalities receiving A–Tax funds must adopt guidelines governing applications for the 65% Funds and appoint a local advisory committee to make recommendations on the expenditure of A–Tax revenues.[3] S.C.Code Ann. § 6–4–25(A). The local advisory committee must review all grant applications for tourism-related expenditures and submit a recommendation as to each application to the governing

---

2. Specifically, the Act's restrictions allow expenditure of 65% Funds only for "tourism-related expenditures," which include:
   1. advertising and promotion of tourism so as to develop and increase tourist attendance through the generation of publicity;
   2. promotion of the arts and cultural events;
   3. construction, maintenance, and operation of facilities for civic and cultural activities including construction and maintenance of access and other nearby roads and utilities for the facilities;
   4. the criminal justice system, law enforcement, fire protection, solid waste collection, and health facilities when required to serve tourists and tourist facilities. This is based on the estimated percentage of costs directly attributed to tourists;
   5. public facilities such as restrooms, dressing rooms, parks, and parking lots;
   6. tourist shuttle transportation;
   7. control and repair of waterfront erosion;
   8. operating visitor information centers.
   S.C.Code Ann. § 6–4–10(4)(b). Further, municipalities with "a high concentration of tourism activity" may also use 65% Funds "to provide additional county and municipal services, including, but not limited to, law enforcement, traffic control, public facilities." *Id.*

3. Counties and municipalities receiving $50,000 or less in A–Tax revenues are exempt from local advisory committee requirements. S.C.Code Ann. § 6–4–25(A).

body of the county or municipality. S.C.Code Ann. § 6–4–25(B). Those recommendations are considered by, but are not binding upon, the local governing body in determining how 65% Funds will be spent. S.C.Code Ann. § 6–4–25(C).

Counties and municipalities receiving A–Tax funds must submit annual reports, which TERC reviews to ensure all expenditures comply with the Act's restrictions. S.C.Code Ann. §§ 6–4–25(D), –35(B)(1)(a). In its annual report, the county or municipality must submit a list of all tourism-related funding requests; the local advisory committee's recommendations; the municipality's action following the recommendations; and an account of "how funds from the accommodations tax are spent." S.C.Code Ann. § 6–4–25(D)(3). The only A–Tax funds outside the scope of TERC's regulatory oversight are the first $25,000 and five percent of the balance statutorily allocated to the general fund. S.C.Code Ann. §§ 6–4–10(2), 6–4–25(D)(3).

If TERC questions a particular expenditure, it must notify the county or municipality and may consider any "further supporting information" the county or municipality wishes TERC to consider in its compliance determination. S.C.Code Ann. § 6–4–35(B)(1)(a). Section 6–4–35(B) further provides that "[i]f [TERC] finds an expenditure to be in noncompliance, it shall certify the noncompliance to the State Treasurer, who shall withhold the amount of the expenditure found in noncompliance from subsequent distributions in accommodations tax revenue otherwise due the municipality or county."

## II.

For fiscal year 2008–2009, the City received A–Tax funds in excess of $6 million, most of which constituted 65% Funds subject to the restrictions and guidelines in the Act. Twenty-five organizations submitted grant applications seeking $2,253,586 for tourism-related expenditures from the 65% Funds. The City, however, submitted only twenty-one of those applications to the local advisory committee. Four requests from outside organizations totaling $302,545 were not forwarded to the local advisory committee for review and recommendation and were not reported to TERC in the City's

annual report.[4]  This case concerns the four tourism-related grants to outside entities in the amount of $302,545, which TERC ultimately certified as noncompliant with the Act.

Thereafter, the City appealed TERC's noncompliance certification by requesting a contested case hearing with the ALC. The City claimed it was not required to submit those applications to the local committee or report them or the funding grants to TERC because the source of those particular funds was the City's general fund.  The City asserted that A–Tax funds were not involved in the four questioned tourism-related expenditures.  Contrary to the City's attempt to assign a position to TERC it never advanced (but was embraced by the ALC), TERC has never challenged the ability of the City to spend general funds.  TERC concedes the obvious—a municipality or county may spend general funds as it sees fit, free from outside interference.

In response, TERC argued the funds at issue were A–Tax funds, and therefore the four grant applications were required to be forwarded to the local advisory committee for review and included on the City's annual report pursuant to the Act. *See* S.C.Code Ann. § 6–4–25(B), (D)(3).  TERC claimed the City cannot rely on its decision to "sweep" (or transfer) A–Tax funds into its general fund and then subsequently fund grant applications for tourism-related expenditures, thereby circumventing the Act. The expenditure of A–Tax funds, according to TERC, must be accomplished pursuant to the Act. Accordingly, a local government cannot evade the Act's requirements by a mere bookkeeping transfer or "sweep" from the A–Tax fund to the general fund.  We agree with TERC.

The ALC found that the four questioned grants totaling $302,545 were disbursed from the City's general funds, a finding with no support in the record.  The City's internal

---

4.  TERC requested that the City provide it with additional information regarding the City's award of the questioned tourism-related grants. When the City refused to provide additional information, TERC obtained the information by filing a request pursuant to the South Carolina Freedom of Information Act, S.C.Code Ann. §§ 30–4–10 to –165. Based on the City's brazen refusal to cooperate with TERC's request, we reject the dissent's suggestion that the City should receive another opportunity to submit additional evidence relating to the questioned grants.  *See* S.C.Code Ann. § 1–23–610(B) ("The review of the administrative law judge's order must be confined to the record.").

documents reveal that the City sought to "sweep" the A–Tax Funds into the general fund. The City's March 14, 2008 memorandum admits that "Council decided to sweep accommodations tax funds to the General Fund to cover tourism-related public services. Subsequent to the decision to utilize accommodations tax funds in the General Fund, council awarded outside grants to several agencies originally requesting accommodations funding." The inescapable conclusion from the March 14, 2008 memorandum is that the City simply decided to transfer ("sweep") A–Tax funds to the general fund.[5] It was these very funds that the City used to fund the tourism-related grants that are in dispute.

We fully recognize that the four challenged grants reek of tourism-related expenditures. TERC has never suggested it would not have approved the expenditures; TERC's complaint is process-driven in that the City did not follow the Act.

---

5. The dissent agrees with our premise "that a municipality may not transfer the 65% Funds to its general fund and then grant those same funds to outside entities. To permit a municipality to do so would allow it to circumvent the TERC and local advisory committee oversight mandated by the Act." Based on the record before us, which is limited only by the City's own actions in refusing to provide additional substantiating information, that is precisely what the City has done in this case. The dissent seeks to recast the dispute as an unresolved question of fact as to whether the funds at issue were general funds or A–Tax funds. In this regard, the dissent would remand for the City to have a second bite at the apple by "remand[ing] for a new hearing and the presentation of additional evidence in accordance with what I believe is the correct standard." The dissent's "correct standard" is one never raised by the City. Indeed, the ALC based its erroneous decision on the very theory advanced by the City. We see no reason to afford the City a reprieve from a situation its own conduct induced. *See Erickson v. Jones St. Publishers, LLC,* 368 S.C. 444, 476, 629 S.E.2d 653, 670 (2006) (holding that a party may not complain of an error his own conduct has induced); *Porter v. S.C. Pub. Serv. Comm'n,* 333 S.C. 12, 32, 507 S.E.2d 328, 338 (1998) (noting that an "administrative agency may not consider additional evidence upon remand unless [this] Court allows it because that affords a party two bites at the apple" (citing *Parker v. S.C. Pub. Serv. Comm'n,* 288 S.C. 304, 342 S.E.2d 403 (1986))). We view in a similar light the dissent's extensive quoting from the record as advancing arguments on behalf of the City, arguments the City has never argued on appeal and are nowhere to be found in the City's brief. *See Wierszewski v. Tokarick,* 308 S.C. 441, 444 n. 2, 418 S.E.2d 557, 559 n. 2 (Ct.App.1992) (finding that where a party fails to raise an issue or file a brief indicating how and why an appellate court should reach it, the appellate court need not address the issue).

Technically, TERC's position is legally correct in this case. We emphasize the narrow reach of our holding today to the funding of outside entities with 65% Funds. We must also acknowledge that the Act grants local governments latitude in the expenditure of 65% Funds. For example, section 6–4–10(4)(b) authorizes a local government with "a high concentration of tourism activity" to utilize 65% Funds to provide additional fire protection and law enforcement. It is undisputed that the City has "a high concentration of tourism activity." [6] Yet, we must also recognize that the challenged $302,545 A–Tax funds were granted to outside agencies, just as the March 14, 2008 memorandum admits. Because these expenditures were not forwarded to the local advisory committee for review and recommendation or reported to TERC in the City's annual report, we are constrained to conclude the City failed to comply with the Act.

Moreover, the City submits a broader argument, one we do not lightly reject. The City contends that the budgeting process for the City is complex on many levels and beyond judicial ken. While this argument may have merit, it cannot serve as a basis to avoid a justiciable controversy. Here the Legislature has created a complex statutory scheme for the expenditure of accommodation tax revenues, and we must do our best to construe and apply the Act as intended by the Legislature. The wisdom or folly of the Act is not for us to judge; we must enforce the Act as written.

In recasting the case, the dissent posits that "[t]he City argued the determinative issue was what the A–Tax monies were spent on, not where the monies were held before being spent." Yet the thrust of the City's case before the ALC was focused on the City's ability to spend its general fund, free from the requirements of the Act. The fact remains that the City granted admitted A–Tax funds to outside agencies as

---

6. The City makes this very point in its brief: "the [A]ct expressly gives local governments like the City with high concentrations of tourism the authority to use accommodation tax revenues for law enforcement, traffic control, public facilities, and highway and street maintenance expenditures provided the expenditures are related to the additional costs associated with providing for tourism activity." We do not disagree with the City's construction of the Act, other than to note the A–Tax funds at issue here were spent on tourism-related grants to outside agencies.

tourism-related expenditures, and the Act requires a specific process to be followed when doing so. We find there is nothing in the Act sanctioning the procedure employed by the City here. "Where a special fund is created or set aside by statute for a particular purpose or use, it must be administered and expended in accordance with the statute, and may be applied only to the purpose for which it was created or set aside, and not diverted to any other purpose, or transferred from such authorized fund to any other fund." 81A C.J.S. *States* § 387.

Moreover, in its brief, the City invites the reader to study the testimony of its Budget Director, Mike Shelton, who purportedly explained the City's bookkeeping and accounting practices in detail. This detail, we are told, includes the City's scrupulous compliance with the law, presumably including the Act. We have read Mr. Shelton's testimony, and we cannot find the supporting testimony that is referenced in the City's brief. We are left with a claim that this case involves only general funds, a claim that we find is unsupported by any evidence in the record, which is the result of the City's own failure to submit additional substantiating information to TERC and the City's failure to present adequate testimony at the hearing to substantiate its claim. Based on the record before us, the truth is no more complicated than the March 14, 2008 memorandum. That admission in the City's internal documents leads this Court to conclude that the $302,545 in questioned expenditures are unmistakably traceable and attributable to A–Tax funds, not general funds. Thus, the relevant legal issue is whether these A–Tax expenditures complied with the Act—not whether the City may spend its general funds free from the strictures of the Act. In accepting the City's argument, the ALC committed an error of law by myopically framing the question presented as encompassing only the latter.

In sum, we are presented with the use of A–Tax funds (specifically 65% Funds) for tourism-related expenses, accomplished in contravention of the Act. Accordingly, we reverse the ALC and reinstate TERC's certification of noncompliance concerning the questioned tourism-related grants totaling $302,545.

**REVERSED.**

PLEICONES, J., and Acting Justice James E. Moore, concur. HEARN, J., dissenting in a separate opinion in which BEATTY, J., concurs.

Justice HEARN.

Respectfully, I dissent. While I agree with much of the majority's analysis, particularly its conclusions that the ALC erred and that a municipality may not circumvent the Act, I disagree with its penultimate decision that the City circumvented the Act. Because I believe the majority employs the wrong standard in making that determination, I would reverse and remand for additional evidence and a new determination by the ALC under what I believe to be the correct standard.

First, I concur with the majority's implied holding that the ALC erred in concluding the Act, specifically section 6–4–10(1), explicitly exempts a municipality's general funds from the Act's requirements. The Act does clearly exempt the first $25,000 of A–Tax revenue and 5% of the balance of the revenue from the Act's requirements and TERC's oversight. *See* S.C.Code Ann. §§ 6–4–10(1) & (2) (2004). However, the Act contains no such exemption for the 65% Funds at issue here. Rather, the Act sets forth a detailed procedure that must be followed for the disbursement of the 65% Funds. *See* S.C.Code Ann. § 6–4–10(4) (2004).

I also agree with the majority's implied holding that a municipality may not do indirectly what it cannot do directly. *See City of Rock Hill v. Pub. Serv. Comm'n of S.C.*, 308 S.C. 175, 178, 417 S.E.2d 562, 564 (1992) (rejecting a municipality's position because it "would be tantamount to allowing the [municipality] to do indirectly what it could not do directly"). In other words, I agree that a municipality may not transfer the 65% Funds to its general fund and then grant those same funds to outside entities. To permit a municipality to do so would allow it to circumvent the TERC and local advisory committee oversight mandated by the Act.

Finally, I agree with the majority that it is undisputed a municipality or county may spend its general funds as it wishes, free from TERC or local advisory committee oversight. The ALC erroneously concluded the case could be decided on that principle alone. However, as the majority

makes clear, the real dispute here is whether the City's challenged grants were made using the City's general fund or using the 65% Funds. Thus, the issue is whether the City circumvented the Act by transferring the 65% Funds to its general fund and then "re-granting" those funds.

Where I part company with the majority is in its conclusion that "the $302,545 in questioned expenditures are unmistakably traceable and attributable to A–Tax funds, not general funds." The majority asserts this is an "inescapable conclusion" of the City's March 14, 2008 memorandum which states that "Council decided to sweep accommodations tax funds to the General Fund to cover tourism-related public services. Subsequent to the decision to utilize accommodations tax funds in the General Fund, council awarded outside grants to several agencies originally requesting accommodations funding." More precisely, it appears the majority's holding turns on the use of the word "sweep." Contrary to the majority, I do not believe there is necessarily anything improper about the City "sweeping" the 65% Funds into its general fund.

The Act provides that the 65% Funds may be spent by a county or municipality with a high concentration of tourism to "provide additional county and municipal services, including, but not limited to, law enforcement, traffic control, public facilities, and highway and street maintenance. . . ." S.C.Code Ann. § 6–4–10(4)(b). However, the Act limits such expenditures of the 65% Funds to those that "promote tourism and enlarge its economic benefits through . . . providing those facilities and services which enhance the ability of the county or municipality to attract and provide for tourists." *Id.* In other words, rather than granting the 65% Funds to outside entities, a municipality may retain the funds and use them to provide municipal services for tourists or tourism.

Here, the City properly decided to use the 65% Funds for the provision of "tourism-related public services." [7] In order

7. While the propriety of the City's usage of the 65% Funds for the provision of municipal services was the subject of separate litigation, that case did not resolve the issue, *see Tourism Expenditure Review Comm. v. City of Myrtle Beach,* 403 S.C. 76, 742 S.E.2d 371 (2013), and that issue was not raised in this case. Rather, in this case, the parties agreed that the ALC must presume that the City's use of the 65% Funds for additional municipal services was proper under the Act.

to accomplish that, the City presumably must—but certainly may—transfer the 65% Funds into its general fund. The funds belong to the City, and so long as the City expends them in accordance with the Act, their location prior to expenditure is irrelevant in my view. The Act does not set forth any requirement that the 65% Funds used by a municipality for the provision of tourism-related public services be maintained in a separate account. Accordingly, there is nothing improper about the City transferring—or "sweeping"—the 65% Funds into its general fund, and whether the City circumvented the Act cannot be resolved simply by the fact that this transfer took place.

The majority discusses the possibility of reviewing evidence of the City's bookkeeping and accounting practices, presumably to trace whether the 65% Funds were used for additional municipal services or for the challenged grants, but finds the City failed to present any such evidence. However, I believe the Act does not require us to trace funds in order to determine whether a municipality has circumvented the Act. Quite simply, a dollar is a dollar; money is fungible. For purposes of the Act, it makes no difference whether a dollar with a particular serial number was expended for one purpose as opposed to another. If a municipality transfers the 65% Funds to its general fund for the provision of municipal services, so long as the municipality expends that amount of money for that purpose from its general fund, the Act is satisfied and no circumvention occurred.

Accordingly, I believe the standard for determining whether a municipality circumvented the Act through "re-granting" is whether the municipality actually spent an amount equal to the 65% Funds it transferred to its general fund for the statutorily permissible purpose. For example, here the City would need to establish that it spent the $4,664,951 in 65% Funds it transferred to its general fund as it asserts it did—on the provision of tourism-related municipal services. If the City failed to spend the full amount of the 65% Funds it allocated to itself for this purpose, the City has granted the 65% Funds without the review of the local advisory committee and thus, has circumvented the Act.

The Act supports this interpretation and provides a ready source of evidence for this determination through its requirement of annual reports by municipalities and counties receiving A–Tax funds. Specifically, Section 6–4–25(D)(3) of the South Carolina Code (2004) requires that municipalities and counties receiving A–Tax funds annually submit a report listing how A–Tax funds "are spent." The Act provides that TERC is to receive a copy of those reports. S.C.Code Ann. § 6–4–35(B)(1)(a) (2004). Furthermore, TERC may request additional information from a municipality or county, and if not satisfied that the municipality or county complied with the Act, it may certify an expenditure as noncompliant. *Id.*

The ALC correctly held that a municipality may spend its general funds as it sees fit and is not subject to TERC's oversight in doing so. However, the ALC erroneously presumed that principle resolved the case. Instead, the ALC should have taken the next step and determined whether the City impermissibly circumvented the Act by depositing its 65% Funds in its general fund and then "re-granting" those same funds. Absent this analysis, which I believe to be critical, I cannot agree with the majority's final conclusion that the record before us clearly reveals that the City circumvented the Act. Because the ALC stopped short of reaching the issue, I would reverse and remand for a new hearing and the presentation of additional evidence in accordance with what I believe is the correct standard.

The majority insists that a remand for a new hearing and the presentation of additional evidence would be inappropriate because it would "afford the City a reprieve from a situation its own conduct induced." In support, the majority characterizes the record in this case as "limited *only* by the City's own actions in refusing to provide additional substantiating information" and asserts the standard advanced by this dissent was "never raised by the City." (emphasis added) I believe the record undermines the majority's assertions and establishes that remand is appropriate here.

At the hearing before the ALC, the City advanced the theory that the four grants at issue here were made using general fund monies, whereas the A–Tax monies transferred to the general fund were expended on municipal services.

The City also attempted to present evidence in support of this theory. Specifically, counsel for the City argued before the ALC:

> The State money was spent on the police department.... We took that money and we, under the statute, justifiably paid all of it for additional municipal services.... But our point is, is that all the money that was earmarked for the two percent allocation, all of that money was sent and was reviewed—the applications for that money, all the applications for that money were reviewed by the advisory committee.... They then made those recommendations to the City Council. City Council duly considered those decisions and then made its own decision as to what to do with the money. There's no dispute that the City has the right to do that. Then the money was allocated under the ordinance to additional services.... Now that's how that money was spent. We have some additional money that was spent for four outside grants in the amount of $300,000.... And we're talking about now a 4.6–million–dollar allocation. We're talking about this $300,000 does not come from that $4.6 million. It comes from other funds within the general fund.... We're allowed to do our own planning with the allocations from the revenue fund and it it's—and if we can justifiably say it goes to additional municipal services, then TERC cannot say, "Well, you can't use anything else in your fund. If you're going to give away all that money to your additional municipal services, you can't use anything else in your fund for tourism-related expenditures without having to meet the requirements of the Act."

Additionally, counsel for the City attempted to elicit information relevant to the standard proposed by this dissent from Mike Shelton, budget director for the City. Counsel began to question Shelton about municipal services provided by the City and the amounts expended for those services. TERC objected on the grounds of relevancy. Counsel for the City argued that his line of questioning was relevant in part to show the court "that all of the money—that the two percent was spent on additional municipal services." The court sustained the objection. Counsel for the City then asked Shelton "[I]s there any question in your mind the general funds were

spent on these four grants?" Again, TERC objected on grounds of relevancy, and the court sustained the objection.

The City also advanced this argument on appeal. In addition to arguing a stronger position that the evidence before the ALC clearly established that the A–Tax funds were spent on municipal services, the City also argued more broadly that simply placing the A–Tax monies in the City's general fund did not establish a violation of the Act. The City argued the determinative issue was what the A–Tax monies were spent on, not where the monies were held before being spent. Specifically, the City argued in its brief before this Court:

> Instead of refuting the testimony of Mike Shelton, TERC focused on a single line lifted out of context from an e-mail by a City employee from Mr. Shelton's office. The line upon which TERC's [sic] hangs its claim is: "Council decided to sweep accommodations tax funds to the General Fund to cover tourism related public services." ... TERC's interpretation of "General Fund" as used by the employee in the e-mail is mistaken. *Sweeping accommodations tax funds into the City's General Fund does not mean that the A–Tax special fund lost its identity in the City's accounting procedures. As stated, those funds were properly used and accounted for to cover tourism related public services as indicated by the e-mail.*

(emphasis added). Accordingly, I believe on appeal the City continued to assert, and thus preserved, the arguments it made before the ALC.

Therefore, the City both advanced the theory I propose herein and attempted to present evidence in support of that theory. The ALC erroneously rejected the City's attempts and as the prevailing party, the City had no obligation to seek reconsideration of the ALC's erroneous ruling. *I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 419, 526 S.E.2d 716, 723 (2000). Accordingly, I believe the majority is incorrect in suggesting that the City is responsible for the insufficiency of the record and that a remand and the taking of additional evidence is an inappropriate result.

In conclusion, I believe the ALC erred in several respects and a remand is required. As the majority holds, the ALC erred in finding the City did not violate the Act because it

made the grants from its general funds. I believe the ALC further erred in not permitting the admission of evidence to show that the A–Tax funds were properly expended on municipal services and therefore, the City complied with the Act. Accordingly, I would reverse and remand for a new hearing and the presentation of additional evidence.

BEATTY, J., concurs.